## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

OHSERASE MANUFACTURING LLC,

       Plaintiff,

v.

AIGER GROUP AG SWITZERLAND d/b/a
AIGER ENGINEERING LTD.,

       Defendants.

**COMPLAINT AND JURY DEMAND**

Civil Action No.:
8:25-cv-01073 (MAD/PJE)

Plaintiff, Ohserase Manufacturing LLC ("plaintiff"), by its attorneys, Rupp Pfalzgraf LLC, as and for its complaint against defendant, Aiger Group AG Switzerland d/b/a Aiger Engineering Ltd., alleges as follows:

### JURISDICTION AND VENUE

1.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(2) because the amount in controversy exceeds $75,000 and is between a New York entity and a foreign entity.

2.    Plaintiff is a New York limited liability company with its principal place of business in Akwesasne, New York.

3.    Upon information and belief, defendant is a corporation organized under the laws of Switzerland with its principal offices in Bulgaria.

4.     This Court has personal jurisdiction over defendant because defendant transacted business within New York and contracted to supply goods and services in New York. Defendant purposefully availed itself of the privilege of conducting business in New York by, *inter alia*, entering into a contract to deliver machinery to plaintiff's facility in New York, shipping and installing those machines in New York, and sending its agents and repair technicians into New York to service the Machines over an extended period.

5.     Venue is proper in the Northern District of New York under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District, specifically, Franklin County, New York. The equipment that is the subject of this dispute was delivered to and installed at plaintiff's manufacturing facility in Akwesasne, New York (within this District), and the harm to plaintiff was suffered in this District.

## **PARTIES**

4.     Plaintiff is a limited liability company engaged in cigarette manufacturing, with its principal place of business in Akwesasne, New York. Plaintiff is the purchaser and intended end-user of the cigarette packing machines at issue in this case.

5.     Upon information and belief, defendant is a Swiss business entity with its headquarters and principal place of business in Bulgaria.

- 2 -

6.      Upon information and belief, defendant is in the business of designing, manufacturing, and selling industrial packaging machinery worldwide, including the two cigarette packing lines that are the subject of this dispute.

## **FACTUAL BACKGROUND**

7.      On or about January 24, 2023, defendant provided plaintiff with a detailed written offer for the sale and delivery of two Aiger EON 250 cigarette packing (the "Agreement") machine lines – one "king size" line and one "100s" (100 mm) line (the "Machines") – for a total price of €2,200,000 (approx. $2,314,840 USD in January 2023).  A true and accurate copy of the Agreement is attached hereto as Exhibit A.

8.      The Machines as represented to plaintiff by defendant proudly touted to meet all the very exacting specifications provided by plaintiff in its request for proposal. This satisfying of specifications and  the promised performance met every request, thus making  the Agreement particularly interesting to plaintiff.

9.      The Agreement outlined the key terms of the proposed contract (the "Agreement"), including the scope of equipment, pricing, and performance guarantees. Plaintiff accepted defendant's offer.

10.      Under the Agreement, defendant was obligated to manufacture, deliver, and install the Machines at plaintiff's New York facility, and to ensure they met certain performance standards.  *See* Exhibit A.

11.     The Agreement specified that shipment of the Machines would occur within approximately 10 months of the offer (i.e., by late 2023).  *See* Exhibit A, p. 4.

12.     In fact, the parties agreed that the 100s line would be delivered by November 2023 and the king size line by December 2023 – these delivery deadlines were crucial, as they would allow plaintiff to make necessary repairs to its existing machines and the Machines would bridge the gap.

13.     The offer also set forth various support and warranty provisions: for example, defendant promised that a service technician would be available on-site within 72 hours of any request, that critical spare parts would be delivered in the "shortest time possible," and that an acceptance test would be conducted over three continuous eight-hour shifts once installation was complete.  *See id*.

14.     Defendant further guaranteed the Machines for 2,100 operational hours or 12 months from acceptance, and warranted their performance at a speed of "250 packs per minute at 80% efficiency."  *See id*.

15.     In short, defendant expressly represented that the Machines would be high-speed, fully-operational packaging lines meeting specific output and efficiency criteria.

16.    As with most things that seem too good to be true, the Agreement was, and problems arose almost immediately when defendant failed to meet the agreed delivery schedule.

17.    Indeed, the Machines were not delivered within the promised 10-month timeframe, with the king size line not arriving until on or about June 19, 2024 – 6 months after promised delivery – and the 100s line not arriving until around September 24, 2024 – 10 months after promised delivery.

18.    The substantial delays in delivery immediately disrupted plaintiff's operations since, as stated above, plaintiff had planned its production schedule in reliance on the timely arrival of the Machines.

19.    Due to defendant's apparent ineptness or perhaps willing deception, plaintiff faced the prospect of having no packing machines available for an extended period and was forced to take costly measures to mitigate this problem.

20.    To avoid a complete shutdown of its packaging operations during the period its old machines were down for upgrades (and the Machines had not yet arrived), plaintiff had to modify its production plans and run existing equipment longer and harder than anticipated.

21.     Plaintiff was also required to pay its employees substantial overtime to meet production demands that the new Machines were supposed to handle.

22.     In total, plaintiff incurred over $23,000 in overtime wages as a direct result of defendant's inability to deliver the Machines on schedule.

23.     These overtime payments were a substantial expense that would have been unnecessary had defendant honored its delivery obligations.

24.     When the Machines finally arrived and were set up in mid-to-late 2024, plaintiff was excited to get them up and running.

25.     Plaintiff immediately came crashing back to earth when the Machines were turned on, and plaintiff was given a glimpse of the problems that would haunt it for the next year and a half.

26.     Although defendant had provided plaintiff with a video purportedly showing the Machines operating at full speed prior to shipment, components began breaking almost immediately.

27.     In the initial attempts to get at least one machine working, parts from one Machine had to be cannibalized to patch the other, just to achieve short spurts of operation – this would become common practice in the months to come.

28.    Put plainly, the Machines were completely misrepresented, poorly designed and constructed and are incapable of performing at even a fraction of their promised capability.

29.    In practice, plaintiff has had little chance of seeing the Machines run at even a meager 200 packs per minute – well-short of plaintiff's specifications.

30.    On the off chance that the Machines ran at 200 packs per minute, it was only for brief periods before the Machines began falling apart at the seams – a far cry from the 250 packs per minute speed promised.

31.    In light of the Machines's constant malfunctions, defendant was compelled to keep the installation team onsite since initial delivery, where they appeared to be performing development work rather than strictly installation.

32.    These technicians have been at plaintiff's facility daily since delivery of the Machines, only leaving for holiday travel and when their visas were coming to an end.  At this point, the technicians better resemble plaintiff's employees than defendant's.

33.    Throughout 2024, the technicians nursed the Machines along in a manner unheard of in the industry.

34.    Plaintiff did everything in its power to accommodate and assist defendant with its feeble attempts to repair the Machines, which included covering certain service visit costs such as lodging and local transport for defendant's technicians, as required by the Agreement.

35.    Needless to say, the length and frequency of defendant's service visits went far beyond what could have been contemplated when the contract was made.  To wit, over the course of many months of constant repairs, plaintiff was forced to pay approximately $49,636.25 in hotel lodging and vehicle rental costs for defendant's technicians.

36.    This figure hardly evidences routine service accommodation cost that might accompany a properly functioning machine, and represents yet another direct loss caused by defendant's failure to deliver working equipment.

37.    As another testament to its ignorance and astonishing lack of competence, defendant, inexplicably, did not have many of the critical replacement parts needed to fix the Machines's recurring issues, which compounded many of the problems.

38.    Upon information and belief, defendant lacked basic spare parts in inventory and had to special-order components from overseas.  These delays in obtaining parts extended the Machines' downtime and left plaintiff in an untenable position – either wait for defendant to import parts, or attempt to have parts fabricated locally to keep the Machines limping along.

39.    Both scenarios resulted in further expense and uncertainty for plaintiff, and underscores defendant's inability to support the very equipment it sold as "industry proven" and ready for operation. *See id*. at p. 2.

40.    Like an unending nightmare, plaintiff would return to its facility every day to find a new issue with the Machines, and by late 2024, defendant's technicians had spent considerable time in New York struggling to stabilize the impotent Machines.

41.    Just before the peak of plaintiff's year-end production season, on or around November 25, 2024, defendant made the obtuse decision to recall its repair team back to Europe, leaving plaintiff in the lurch with two barely functional Machines on the verge of complete shutdown.

42.    Plaintiff can only hope that defendant's decision to recall its team was a result of its own obliviousness and was not intentional.

43.    Faced with the prospect of the Machines becoming glorified paperweights during the busiest time of year, plaintiff was forced into a difficult choice: either accept significant production losses or pay extra to keep a technician on site through the holidays.

44.    Not willing to risk a total production standstill and product shortages, plaintiff agreed to pay an additional $18,000 in incentive compensation to one of defendant's technicians so that he would remain in New York through mid-December 2024.

45.    Essentially, plaintiff had to bankroll defendant's technician to "babysit" the king size Machine while it ran at a reduced speed, just to ensure someone was present to address the inevitable breakdowns.

46.    This extraordinary measure – paying $18,000 for a few weeks of monitoring a malfunctioning machine – highlights the severity of the Machines's defects and the lengths to which plaintiff had to go simply to scrape by with minimal operations.

47.    All of these costs and headaches were directly caused by defendant's failure to deliver the Machines in a condition that even resembled a shred of what was promised.

48.    Throughout this difficult two-year period, plaintiff upheld its end of the bargain, by (1) paying approximately $2,685,245.00 for the Machines as agreed (the remaining 10% of the contract price was not to be paid until after acceptance testing was complete), as well as additional expenses associated with maintenance of the Machines; (2) investing in site preparations and staff training for the new lines; and (3) providing defendant's personnel unfettered access to its facility to perform installations and repairs.

49.    Plaintiff relied on defendant's contractual promises and expertise, expecting to receive two state-of-the-art packing lines that would enhance its production efficiency.

50.    Instead, plaintiff was saddled with defective machines that never met the contracted specifications and, frankly, have lost more than they have gained.

51.    Moreover, plaintiff suffered significant business disruption and incurred large out-of-pocket expenses trying to mitigate defendant's ineptitude.

52.    Despite countless modifications and hours devoted to the project, the Machines remain in "evaluation status," running for only short periods of time to assess needs, and are incapable of mass production – a state of functional purgatory.

53.    By January 2025, after nearly two years of defendant's failures to cure these issues, plaintiff (through counsel) sent a detailed letter documenting the problems and seeking a final opportunity to resolve the matter.

54.    Following several communications back and forth between the parties, and defendant acknowledging its contractual obligations under the Agreement, it was agreed that defendant would complete the acceptance test for the king line by March 15, 2025, and the 100 line by April 30, 2025.

55.    Despite defendant's claim that the Machines were its "top priority" and insistence that it had been using its "best technicians" and "spared no expense", those dates came and went with no acceptance testing successfully completed.

56.     In a brazen attempt to deceive plaintiff again, defendant claimed that the acceptance criteria were met on the king size line; however, a review of plaintiff's security camera footage showed that the king size line was nowhere near the 80% efficiency threshold.

57.     When challenged, defendant tucked its tail between its legs and admitted to misrepresenting the results of the acceptance test.

58.     Defendant has recently changed its tact, and now attempts to repudiate or renounce its obligations despite demonstrative acknowledgment of the Agreement's force and effect.

59.     Specifically, on July 9, 2025, plaintiff received an email from defendant's newly minted CEO, Dimitar Yanchev ("Mr. Yanchev").

60.     In his email, Mr. Yanchev stated that he was the founder of defendant, and after stepping away in 2022, was brought back in to turn things around.

61.     Mr. Yanchev mentioned several changes that he has made since taking over as CEO, which included, as relevant, here, discontinuing all production of packing machines "due to immaturity of the packing equipment product line" – this decision was apt, but a couple years too late for plaintiff.

62.     Astonishingly, Mr. Yanchev disclosed in that email that the Machines were only capable of runing at 200 packs per minute, which was significantly out of scope and was rejected by plaintiff.

63.     Based on Mr. Yanchev's email, defendant seemingly changed the represented speed of the Machines to be 250 packs per minute and increased the prices, thus committing an egregious and deliberate misrepresentation to entice plaintiff into purchasing the falsely represented equipment.

64.     Laughably, Mr. Yanchev went on to explain that the Agreement was invalid because (1) defendant's employee that provided the offer in January 2023 "exceed[ed] his authority"; (2) the Agreement allegedly expired prior to plaintiff's acceptance of the offer; and (3) there "are no binding documents between" the parties.

65.     Plaintiff forgives Mr. Yanchev's apparent willful blindness given that he only recently became involved in this matter; however, the events of the last year tell an entirely different story.

66.     Candidly, Mr. Yanchev attempt to skirt defendant's contractual obligations is too little to late given defendant's actions, which clearly ratify the Agreement.

67.    For example, (1) shipping the Machines (albeit late); (2) dispatching technicians to plaintiff's facility for installations and repairs; and (3) having Executive Board member Kaloyan Yanchev expressly affirm that fulfilling plaintiff's contract was a priority.

68.    These communications and actions confirmed that the parties' contract was in force and that defendant recognized its duty to deliver functioning Machines to plaintiff.

69.    In sum, defendant induced plaintiff to enter an agreement with promises of high-performance machinery and reliable support – impressively, defendant provided neither.

70.    The Machines were delivered very late, never worked as warranted, and still have not been accepted by plaintiff due to their failure to meet contractual standards.

71.    Further, plaintiff has incurred substantial damages, including but not limited to at least $90,636.25 in incidental costs (overtime wages, lodging, travel, and extra payments to defendant's personnel) directly attributable to defendant's breaches, and additional consequential losses such as lost productivity and lost business opportunities caused by not having functional packing equipment for an extended period.

72.    Although defendant touted its technical prowess, plaintiff learned that defendant had never built a machine like the Machines sold to plaintiff, and even more alarming, defendant admitted that it is impossible to create machines with the functionality promised.

73.    Seemingly, plaintiff was made a guinea pig for defendant's experiments, all of which continuously and spectacularly failed.

74.    As an exclamation point on defendant's abject failure, after nearly two years of work, on August 5, 2025, defendant simply threw up its hands and deserted the project altogether, leaving plaintiff nearly $3 million in the hole and with two machines that are better suited as coat racks than packing machines.

75.    It should be noted that, at the time of defendant's desertion, plaintiff compiled and documented a punch list totaling 33 significant deficiencies, broken parts and other operational flaws, many of which were created by defendant itself.  Several of these deficiencies are highlighted below:

      a.    A piece of tape is currently being used to block a sensor to force the 100 line machine to continue operating, despite malfunctions.



b.  Pieces of paper were used by defendant's team as makeshift shims to address issues with jamming on the 100 line machine.



c.  The swing arm responsible for folding packages on the 100 line machine has been repeatedly bent is now compromised.



d. The king line machine's glue line is not currently connected to anything and the machine was being manually filled from a plastic water bottle.



e. Temporary weights are temporarily affixed to the king size machine to prevent various issues, but have resulted in additional issues.



f.   The king size machine is literally being held together with duct tape.



76.    These actions leave one to wonder if defendant would have acted in the same, ostensibly unethical manner if plaintiff was a major tobacco company instead of a smaller Native American owned company, and further, whether it would have shown the same level of disregard by simply walking out on an unfinished job.

**FIRST CAUSE OF ACTION**
**(Breach of Contract)**

77.    Plaintiff repeats and re-alleges each and every allegation previously set forth in paragraphs 1 through 76 of this complaint as if set forth fully herein.

78.    A valid and enforceable contract (the Agreement) exists between plaintiff and defendant for the sale, delivery, and commissioning of two packing machine lines in exchange for payment of €2.2 million ($2,314,840 USD).

79.    Plaintiff duly accepted defendant's written offer, forming a contract supported by mutual assent and valuable consideration – the Agreement was later ratified by defendant through its conduct and expressly via email.

80.    Plaintiff has performed all of its material obligations under the Agreement, by (1) making payment in accordance with the Agreement's terms; (2) providing the necessary facilities and access for installation; and (3) cooperated with defendant's technicians in efforts to get the Machines operational.

81.    Defendant materially breached the Agreement through its actions and failures to act, including but not limited to the following:

    a.    **Failure to Timely Deliver:**  Defendant did not deliver the Machines by the agreed delivery dates (November and December 2023), instead delivering the equipment many months later in June and September 2024.

    b.    **Non-Conforming Goods:**  Defendant delivered Machines that failed to conform to the contract's express warranties and performance specifications.

    c.    **Failure to Repair or Cure:**  Despite numerous attempts, over an extended period, defendant's technicians were unable to bring the Machines up to contractually required standards.

82.    As a direct and proximate result of defendant's material breaches, plaintiff has suffered significant damages, which include, (1) the loss of approximately $2,685,245.00 paid for machines that do not operate as promised; (2) substantial incidental and consequential damages, such as the overtime wages, travel and lodging expenses, and extra payments to defendant's personnel that plaintiff had to incur to cope with defendant's delayed and deficient performance (totaling at least $90,636.25 as of early 2025); and (3) other business losses including lost productivity and income attributable to not having functioning packing lines as scheduled.

83.    Plaintiff is entitled to recover all provable damages flowing from defendant's breaches of contract, in an amount to be established at trial, but not less than $2,775,881.25, plus all other incidental and consequential damages, pre-judgment interest as allowed by law, and such other relief as set forth below.

## SECOND CAUSE OF ACTION
### (Unjust Enrichment)

84.    Plaintiff repeats and re-alleges each and every allegation previously set forth in paragraphs 1 through 83 of this complaint as if set forth fully herein.

85.    Plaintiff conferred a substantial benefit upon defendant by paying valuable consideration to defendant and/or providing defendant with other valuable resources associated with the purchase of the Machines.

86.     Specifically, plaintiff has paid 90% of the purchase price and material costs – totaling approximately $2,685,245.00 – and the cost associated with lodging, transportation, and other accommodations during defendant's on-site service visits.

87.     Defendant (1) appreciated or had knowledge of these benefits; (2) accepted the purchase money from plaintiff for the Machines; (3) was fully aware that plaintiff was expending additional money to support defendant's technicians and to mitigate the Machines's failures; and (4) voluntarily retained these benefits.

88.     Under the circumstances, it is against equity and good conscience to permit defendant to retain the benefits that plaintiff conferred without providing a functioning product or adequate compensation in return.

89.     If the contract is deemed unenforceable or if legal remedies are for some reason inadequate, defendant should not be allowed to keep plaintiff's money while plaintiff is left with nothing of value.

90.     Accordingly, plaintiff seeks restitution of the benefits unjustly retained by defendant. This includes restitution of all amounts to be established at trial, but not less than $2,775,881.25, plus all other incidental and consequential damages, pre-judgment interest as allowed by law, and such other relief as set forth below.

## THIRD CAUSE OF ACTION
### (Fraudulent Misrepresentation)

91.    Plaintiff repeats and re-alleges each and every allegation previously set forth in paragraphs 1 through 90 of this complaint as if set forth fully herein.

92.    Prior to and in connection with the formation of the Agreement, defendant made material misrepresentations of fact to plaintiff, including but not limited to the following:

   a. **Performance Specifications:** Defendant represented that the Machines would operate at a speed of "250 packs per minute at 80% efficiency" and would meet all of plaintiff's "very exacting specifications," when defendant knew or should have known that such performance was impossible to achieve;

   b. **Readiness and Capability:** Defendant represented that the Machines were "industry proven" and ready for operation, when defendant knew that it had never built machines like those sold to plaintiff and that the machines were seemingly experimental in nature;

   c. **Delivery Timeline:** Defendant represented that the Machines would be delivered within approximately 10 months (by late 2023), specifically promising delivery of the 100s line by November 2023 and the king size line by December 2023, when defendant knew or should have known it could not meet these deadlines; and

   d. **Technical Competence:** Defendant represented that it possessed the technical expertise and capability to design, manufacture, and deliver fully functional cigarette packing machines meeting plaintiff's specifications, when defendant knew that its "packing equipment product line" was immature and inadequate.

93.    As outlined herein, these representations could not have been further from the truth, and defendant was aware of same when the representations were made.

94.    Defendant made these misrepresentations with knowledge of their falsity, or alternatively, with reckless disregard for their truth or falsity.

95.    Defendant made these misrepresentations with the intent to induce plaintiff to enter into the Agreement and purchase the Machines.

96.    Plaintiff justifiably relied on defendant's misrepresentations in deciding to enter into the Agreement, as defendant held itself out as an experienced manufacturer of industrial packaging machinery and provided detailed technical specifications and performance guarantees.

97.    Plaintiff's reliance was reasonable under the circumstances, as defendant provided a detailed written offer with specific technical specifications, performance guarantees, and delivery timelines, and represented itself as having the expertise to fulfill these commitments.

98.    As a direct and proximate result of defendant's fraudulent misrepresentations and plaintiff's justifiable reliance thereon, plaintiff has suffered substantial damages.

99.    Defendant's conduct was willful, wanton, and in reckless disregard of plaintiff's rights, entitling plaintiff to punitive damages.

100.     Accordingly, plaintiff seeks actual damages in an amount to be established at trial but not less than $2,775,881.25, punitive damages, pre-judgment interest as allowed by law, and such other relief as set forth below.

**WHEREFORE**, pursuant to Rule 38 of the Federal Rules of Civil Procedure, Ohserase Manufacturing LLC demands trial by jury in this action of issues so triable and judgment against defendant as follows:

(1) On its first cause of action, judgment as against defendant in an amount to be determined at trial but no less than $2,775,881.25, plus costs, attorneys' fees, and disbursements;

(2) On its second cause of action, judgment as against defendant in an amount to be determined at trial but no less than $2,775,881.25, plus costs, attorneys' fees, and disbursements;

(3) On its third cause of action, judgment as against defendant in an amount to be determined at trial but no less than $2,775,881.25, plus cost, attorneys' fees, disbursements, and punitive damages;

(4) The costs and disbursements of this action, together with any other or further relief as this Court may deem just and proper.

Dated:  August 11, 2025
        Buffalo, New York

                          **RUPP PFALZGRAF LLC**
                          *Attorneys for the Plaintiff*
                          Ohserase Manufacturing LLC


                          By: _____
                                James Graber, Esq.
                          1600 Liberty Building
                          Buffalo, New York 14202-3502
                          (716) 854-3400